## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**BRENDA TURLEY FRYE,**

   **Plaintiff,**

**vs.**                                                    **CIVIL ACTION NO. 2:15-15155**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

   **Defendant.**

### <u>MEMORANDUM OPINION</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Presently pending before the Court are parties' cross-motions for Judgment on the Pleadings. (Document Nos. 13 and 16.) Both parties have consented in writing to a decision by the United States Magistrate Judge.[1] (Document Nos. 5 and 6.)

The Plaintiff, Brenda Turley Frye, hereinafter "Claimant", filed applications for DIB and SSI on March 28, 2012[2] (protective filing date), alleging disability since April 15, 2010, due to "depression".[3] (Tr. at 272.) Claimant's applications were denied initially (Tr. at 108-112, 113-

---

[1] This case was assigned to the undersigned by Order entered January 5, 2016 due to the retirement of U.S. Magistrate Judge R. Clarke VanDervort. (Document No. 9.)

[2] The undersigned notes that Claimant avers that the ALJ's decision recites an application date of March 28, 2012, and that she applied for DIB on March 29, 2012 (Document No. 13 at 2.), although the Application Summary for Disability Insurance Benefits states the application date is March 28, 2012. (Tr. at 183-184.) Claimant also avers that the ALJ recites an application date of March 28, 2012, and that she filed her application for SSI on March 30, 2012, yet the Application Summary for Supplemental Security Income recites an application date of March 30, 2012. (Tr. at 185-190.) However, this is immaterial to the undersigned's findings herein.

[3] On her form Disability Report – Appeal, dated July 12, 2012, Claimant asserted that since her last disability report dated March 29, 2012, her dosage "on my Citalopram was not helping. Upped it to 40 mlg" and that she "stay[s] in

117.) and upon reconsideration. (Tr. at 120-122, 123-125.) On January 17, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 129-130.) A hearing was held on March 5, 2014 before the Honorable Edward E. Evans. (Tr. at 27-69.) The ALJ denied her claims by decision dated March 27, 2014. (Tr. at 7-26.) The ALJ's decision became the final decision of the Commissioner on September 12, 2015 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On November 13, 2015, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

---

more, don't get out as much spend more time alone". (Tr. at 228.) A Disability Report – Appeals submitted on January 24, 2013 indicated that since October 12, 2012, Claimant alleged: "get out less, angry, have more trouble remembering things, fatigue, sleep less" and she experienced "more fatigue, moody, sleep less, just don't care about much of anything". (Tr. at 262-263.)

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. at 12, Finding No. 1.) The ALJ then found that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, April 15, 2010. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: obesity; breathing problems; depressive disorder; and anxiety disorder. (Id., Finding No. 3.) The ALJ further found additional impairments, hepatic cyst and fibroadenoma, were non-severe. (Id.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 13, Finding

No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform medium work except:

> avoid concentrated exposure to extreme cold, pulmonary irritants, hazards. The claimant may work in a setting where there are few distractions and may interact occasionally with supervisors, colleagues, and the public She may also interact occasionally with co-workers, supervisors and the public.

(Tr. at 15, Finding No. 5.) At step four, the ALJ found that Claimant was incapable of performing any past relevant work. (Tr. at 18, Finding No. 6.) At step five, the ALJ found that Claimant was born on May 20, 1963 and was 46 years of age, making her a younger individual on the alleged onset date, and that she subsequently changed age category to closely approaching advanced age. (Id., Finding No. 7.) The ALJ further found that she has a limited education and able to communicate in English. (Id., Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and RFC indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 9 and 10.) On this basis, benefits were denied. (Tr. at 19, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 50 years old at the time of the ALJ's decision. (Tr. at 18.) Claimant is married, but estranged from her husband and lives with her brother and sister-in-law. (Tr. at 34.) She dropped out of high school in the tenth grade. (Tr. at 38, 207.) She attended truck driver training school and obtained her CDL. (Tr. at 34, 38, 207.) Claimant drove a truck for several years and prior to that, she worked as an upholsterer. (Tr. at 34.)

Issues on Appeal

Claimant has alleged two main errors in support of her appeal: (1) that the decision is not supported by substantial evidence because the ALJ disregarded the opinions of her treating physician and consulting sources (Document No. 13 at 5.); and (2) that the decision is not supported by substantial evidence because the ALJ disregarded the opinion of the vocational expert that Claimant is incapable of substantial gainful activity. (Id. at 10.)

The Relevant Evidence of Record[5]

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The Court has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Medical Records Relating to Breathing Problems:</u>

Claimant has a history of obesity (Tr. at 291, 390, 484, 505.), and breathing problems related to emphysema and her thirty-year habit of smoking more than two packs of cigarettes daily. (Tr. at 292, 321.) In January 2014, Claimant's lung examination yielded normal findings. (Tr. at 504-505.)

<u>Medical Records Relating to Mental Health Treatment:</u>

Claimant received treatment from September 2011 to February 2014 at Prestera Center for Mental Health, primarily from Marc Spelar, M.D. (Tr. at 284-307, 421-478.) She initiated treatment at her brother's suggestion, but she did not think she had any mental health problem, although she indicated that she did not like to be around people. (Tr. at 287.) The initial provider diagnosed depressive disorder not otherwise specified (NOS) and anxiety disorder NOS. (Tr. at 289.) Subsequent providers diagnosed post-traumatic stress disorder. (Tr. at 297.) A Prestera psychiatrist initially assessed a Global Assessment of Functioning (GAF) scale score of 65[6] (<u>Id</u>.), and providers subsequently assessed a GAF score of 60[7] in October 2011 (Tr. at 298.), December 2011 (Tr. at 299.), and January, March, and June of 2012. (Tr. at 300-301, 306.)  Prestera providers prescribed psychotropic medications including Celexa, Vistaril, and Trazodone. (Tr. at 306, 466-

[6] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM-IV") 32 (4th ed. 1994).

[7] A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." <u>Id</u>.

476.)

When asked to identify her chief complaint, Claimant typically identified no problems: in December 2011, she reported that she was doing okay (Tr. at 299.); in January 2012 she reported doing a little better despite sleep problems (Tr. at 300.); she reported doing "OK" in April 2012 (Tr. at 307.); in March 2012, she reported doing okay despite having stress (Tr. at 301.); and in June 2012, Claimant reported sleeping "good" without medication side effects. (Tr. at 306.) Claimant continued to report taking medications as prescribed and having a fair response with less depression through November 28, 2012. (Tr. at 421, 424-425.) By January 2013, Claimant reported more crying and concern that the medication was not working. (Tr. at 426.) She took Lithium as prescribed in February 2013 but could not sustain it. (Tr. at 427-429.) When she resumed her prior medication, Claimant reported doing better, getting out more, and controlling her emotions and temper better. (Tr. at 429.) In June 2013, she reported taking more Vistaril, and other medications as prescribed, and having a fair response. (Tr. at 430.)

In August 2013, Claimant reported, "I am doing good". (Tr. at 456.) By November 2013, she reported she was "doing ok" despite having anxiety. (Tr. at 460.) On February 18, 2014, Claimant told Dr. Spelar that she was compliant with her medications, denied problems with side effects, and stated she was significantly better than prior to starting treatment at Prestera. (Tr. at 464.)

Treating Psychiatrist, Marc Spelar, M.D. Opinion Evidence:

On February 26, 2014, Dr. Spelar completed a Medical Source Statement (MSS) form and opined that Claimant had several marked and moderate functional limitations in mental work tasks, and would miss five or more days of work monthly due to these limitations. (Tr. at 480-481.) Dr.

Spelar attributed these symptoms to "consistent GAF of 50[8] and 55. Frequently depressed mood and suicidal ideations. Guilt and shame associated with childhood trauma. She tends to isolate herself from others. Very timid in social situations." (Tr. at 479.) Dr. Spelar opined that Claimant's prognosis was "guarded due to chronic nature of PTSD related to childhood sexual abuse." (Id.) Dr. Spelar also opined that Claimant could not manage her own potential benefits. (Tr. at 482.)

       State Agency Psychological Examiner, Kelly Robinson, M.A. Opinion Evidence:

In September 2012, Kelly Robinson, M.A., conducted a psychological evaluation of Claimant at the Commissioner's request. (Tr. at 308-314.) Claimant, who lived with her brother and sister-in-law in a trailer, reported irritability, having a depressed mood for six or seven days weekly, a decline from her previous level of functioning, and a history of sexual and physical abuse. (Tr. at 309-310.) She reported that monthly medication management through Prestera "help some". (Tr. at 309.) Claimant reported that she had no mental health treatment prior to starting her current Prestera treatment. (Tr. at 310.)

Claimant informed Ms. Robinson that she dropped out of school in the ninth grade because her father, suspicious of her social activities, would not let her attend. (Id.) She reported that she stopped working as a truck driver because she had been working with her husband and "he had to get out of the truck". (Id.)

A mental status examination revealed that Claimant exhibited a dysphoric mood and restricted affect and had normal attention, normal concentration, persistence, and pace. (Tr. at 311-312.) Based on her interaction with Ms. Robinson and the office staff, Claimant had moderately deficient social functioning. (Tr. at 312.) Ms. Robinson diagnosed Claimant with Posttraumatic

---

[8] A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." Id.

Stress Disorder, Chronic – By Record, Major Depressive Disorder, Recurrent, Moderate, and by self report, emphysema and problems with her gallbladder. (Tr. at 311.) Ms. Robinson issued a fair prognosis and indicated that Claimant appeared capable of managing her own potential benefits. (Tr. at 313.)

<u>State Agency Consultant Opinion Evidence:</u>

In October 2012, Holly Cloonan, Ph.D., reviewed Claimant's file in light of the requirements of Listings 12.04 and 12.06, and concluded that Claimant was not disabled within the meaning of the Act. (Tr. at 88-93.) Dr. Cloonan concluded that Claimant's depression and anxiety caused only a mild impairment in her daily activities, moderate difficulties in maintaining both social functioning and concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 88.) Dr. Cloonan further opined that Claimant was able to learn and perform work-like activities in settings with few distractions and with no more than occasional interactions with others. (Tr. at 92.) In December 2012, Amy Wirts, M.D., reviewed Claimant's file and concluded that she had no exertional limitations, but needed to avoid concentrated exposure to extreme cold, fumes, odors, dust, gases, and poor ventilation. (Tr. at 90.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

With regard to her mental impairments, Claimant's first argument is that the ALJ gave greater weight to the opinions of non-examining consultants over those provided by her treating psychiatrist and an examining consultant. (Document No. 13 at 5-6.) Claimant contends that the ALJ finding that Dr. Spelar's opinion inconsistent with the evidence and that Claimant was not fully credible is unsupported by the record, and that the ALJ could have issued interrogatories to the examining experts in order to fully develop the case. (Id. at 6.) Further, Claimant argues that

the ALJ deviated from the Regulations in his evaluation of Dr. Spelar's opinion and in his assessment of Claimant's credibility. (Id. at 7-9.) The opinions of Dr. Spelar and Ms. Robinson show that Claimant's mental impairments met the Listings. (Id. at 9-10.) Alternatively, Claimant contends that since her fiftieth birthday, she would "grid out" at the sedentary level. (Id. at 10.) Finally, Claimant asseverates that the ALJ prejudiced Claimant's claim by rejecting the vocational expert's ("VE") testimony that Claimant would be unemployable if she missed five or more days per month, based on Dr. Spelar's opinion. (Id. at 10.) She prays for reversal of the ALJ's decision and an award of benefits, or remand for further proceedings, in addition to her costs. (Id. at 11.)

In response, the Commissioner argues that as an initial matter, Claimant stopped working not due to her impairments, but due to marital problems. (Document No. 16 at 1, 3.) The ALJ properly concluded that Claimant's impairments did not meet or equal Listing 12.04 or 12.06 because she did not satisfy "paragraph B" or "paragraph C" criteria and provided numerous citations in the record supporting those findings; further, pursuant to the Regulations, the ALJ is entitled to rely upon the opinions by State agency consultants. (Id. at 8-10.) The Commissioner argues that Claimant fails to identify any evidence that equals the Listing requirements. (Id. at 10.)

Moreover, pursuant to controlling case law and the Regulations, the ALJ properly weighed the opinion evidence from Claimant's treating psychiatrist because he explicitly addressed the inconsistencies between Dr. Spelar's treatment records, indicating normal mental status examinations and Claimant doing well on medication, and his extreme limitations set forth in his medical source statement. (Id. at 10-12.) The ALJ's reliance on the opinions provided by the State agency consultants and that of the examining consultant was reasonable given that their opinions more accurately reflected the medical evidence of record. (Id. at 13-14.) Further, the ALJ is vested

12

with the exclusive authority to assess Claimant's RFC, and is not required to seek a medical opinion in making this determination. (<u>Id</u>. at 14-15.)

The Commissioner next contends that the ALJ's credibility determination is beyond reproach because it comported with the Regulations and controlling case law, and provided numerous examples from the evidence of record supporting his conclusions, and further, an ALJ's credibility assessment is entitled to great deference. (<u>Id</u>. at 15-17.)

Finally, the Commissioner contends that the ALJ did not have to accept the VE's response to Claimant's attorney's query because it included the severe limitations found by Dr. Spelar, which were unsupported by the objective medical evidence. (<u>Id</u>. at 18-19.) The VE's response to the ALJ's hypothetical presented all of Claimant's functional limitations noted from the evidence of record, which supported the ALJ's finding that Claimant could perform other work. (<u>Id</u>. at 19.) The Commissioner asks the Court to affirm the decision because it is based on substantial evidence. (<u>Id</u>.)

<u>Analysis</u>

<u>Meeting Listing 12.04 or 12.06:</u>

An impairment meets a Listing if it satisfies <u>all</u> the specified medical criteria. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis added); SSR 83-19, 1983 WL 312248, at *23. (1983). The ALJ found Claimant had two severe mental impairments, depressive disorder and anxiety disorder. (Tr. at 12.)

With regard to "paragraph B" criteria, the ALJ found Claimant had mild restriction in her activities of daily living based on her statements in her Function Report: she prepared meals and fixes coffee; cleaned her room; drove a couple of times daily in warm weather or occasionally;

walked around in the yard or sat on the porch when warm outside; and could finish tasks that she started. (Tr. at 14.) In the area of social functioning, the ALJ found Claimant had moderate difficulties: she testified that she avoided others; Ms. Robinson found such difficulties during her examination; and Claimant reported to her treating psychiatrist that she has irritability at times. (Id.) In terms of concentration, persistence or pace, the ALJ found Claimant had moderate difficulties: Claimant testified that she had a hard time focusing; and the State agency found moderate limitations in this area of functioning at the reconsideration level. (Id.) Finally, the ALJ found that Claimant experienced no episodes of decompensation, which were of extended duration. (Id.)

The ALJ found no evidence establishing "paragraph C" criteria. (Tr. at 15.)

In light of the pertinent Regulations, cited *supra*, and given the evidence in the record as noted by the ALJ, the undersigned finds his conclusion that Claimant's impairments do not meet the Listings is supported by substantial evidence.

Evaluation of Opinion Evidence:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[9] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

---

[9] It is noted that the ALJ referenced these Regulations in the written decision. (Tr. at 15.)

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id. Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

Claimant contends that the ALJ erred by not giving proper deference to the medical source statement provided by Dr. Spelar, who opined that Claimant is incapable of substantial gainful activity due to numerous marked and moderate limitations in work related activities. Claimant further takes issue that the ALJ's rejection of her treating psychiatrist's opinion violates Social Security Ruling 96-2p.[10] The ALJ expressly "rejected" Dr. Spelar's opinion for being inconsistent

---

[10] The pertinent segment of SSR 96-2p states as follows:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," *not that the opinion should be rejected*. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical

with the weight of the evidence and cited the following reasons: "current treatment notes from Prestera show [Claimant] is doing okay with her medication with no side effects"; "her sleep is okay as well as her mood"; "[e]ven in February 2014, she reports doing significantly better with treatment, sleeping better, her depression is fairly stable"; and "Dr. Spelar indicated she had a normal mental status exam". (Tr. at 18, 460, 464-465.)

The Fourth Circuit has held that an ALJ is not required to give weight to an assessment prepared by a claimant's treating physician. See Johnson v. Barnhart, 434 F.3d 650, 656 (4th Cir. 2005). In the Johnson case, the claimant's treating physician completed a "Physical Capacities Questionnaire and Assessment" that the ALJ "discredited" because it "inexplicably conflicted with [the treating physician's previous] evaluation and other medical opinions." Id. at 655. (citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (upholding ALJ's rejection of treating physician's opinion because the record contained persuasive contradictory evidence and the treating physician's own notes contradicted his opinion). In short, this Circuit's jurisprudence will permit an ALJ to reject a treating psychiatrist's opinion in the face of persuasive contradictory evidence. Claimant's argument concerning the ALJ's use of the word "rejected" is one of semantics – the ALJ did not outright reject Dr. Spelar's opinion by failing to consider it – that would violate the applicable Ruling and Regulations, the ALJ's "rejection" of Dr. Spelar's opinion was equivalent to giving it 'no weight' due to the aforementioned reasons; this "rejection" is permissible under the Regulations, and is an acceptable practice in the Fourth Circuit.

In addition, the ALJ gave "good reasons" for rejecting Dr. Spelar's opinion as reproduced *supra*. See, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In his February 18, 2014 treatment note,

---

opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. 1996 WL 374188, at *4. (emphasis added)

Dr. Spelar reported the following:

> Records reviewed and relevant hx d/w client today. States sees Kevin for therapy.
> Leery of addictive medication and would prefer to avoid. Symbicort makes more
> anxious/on edge. Reports compliance/denies probs c SEs, states significantly better
> now than prior to starting tx here.
> Reported hx of strange childhood sexual abuse intertwined c religion.
> PCP Dr. Gibbs. No BP meds currently.
> Doing better, takes Paxil at night. Couldn't take it during the day – felt sick to her
> stomach and off-balance/dizzy. Vistaril helps some, not completely. Usually takes
> 3/day, tries to take less when she can. Anxiety characterized by jitteriness, tremors,
> heart palp/increased HR.
> Swears by trazodone for sleep, takes 100 mg usually and will take second 100 mg
> if she still can't sleep.
> Has a lot of depression, comes and goes, good days and bad days. Not really better
> or worse overall since last visit fairly stable. Has occasional SI s intent/plan/action;
> this is chronic. Trouble getting mind to slow down for sleep.
> Occasional dizziness upon standing.

Dr. Spelar further noted that Claimant's general appearance was appropriate; her eye contact

within normal limits; her attitude during the interview was cooperative; her motor activity within

normal limits; her speech/language normal; her mood "ok"; her affect appropriate; no

hallucinations were noted; her thought processes were goal directed and logical; her thought

content was appropriate; and she was alert. Further, no suicidal or homicidal thoughts were noted.

(Tr. at 464-465.) Another treatment note dated that same day by Kevin White, Claimant's

counselor, indicated that she reported:

> to be taking meds as prescribed with a generally fair to good response at this point.
> "I have been doing OK with me medicine and I have been taking it everyday like I
> am suppose to. Sleep is still a little bit up and down. If I go to bed with a lot on my
> mind I don't sleep very good but it is better than it was before. Still not getting out
> much. Just prefer to be to myself."

(Tr. at 433.)

Cited by the ALJ in his "rejection" of Dr. Spelar's opinion, a treatment note dated November 6,

2013 by Dr. Noor Kazi at Prestera is the most recent physician treatment note in the record

preceding Dr. Spelar's records in February 2014. (Tr. at 460.) On that day, Dr. Kazi informed Claimant that she would be leaving and that Claimant will see another doctor. (Tr. at 462.) Dr. Kazi noted that Claimant reported, "I am doing ok but still have anxiety. Mood, sleep are ok. Still have anxiety. No side effect of med or other concern." (Tr. at 460.)

In short, the ALJ's "rejection" of Dr. Spelar's medical source statement and the reasons given for this rejection complied with the pertinent Regulations and case law and is based on substantial evidence.

With respect to Ms. Robinson's opinion, the ALJ did not explicitly assign weight to it, but noted Ms. Robinson's diagnoses and her findings as a result of Claimant's mental status examination; the ALJ adopted Ms. Robinson's conclusion that Claimant had moderate difficulties in social functioning, but ostensibly rejected her conclusion that Claimant's concentration, persistence and pace were within normal limits.[11] (Tr. at 13, 15, 312.) Regarding the other State agency opinions provided by Drs. Cloonan and Wirts, the ALJ expressly found their conclusions supported by the evidence of record and accorded those opinions great weight. (Tr. at 17.) Indeed, the ALJ fully adopted their physical and mental limitations findings in formulating the RFC, and were reflected in the hypothetical question he posed to the vocational expert during the hearing. (Tr. at 17, 63-64, 88, 90, 92, 101, 103, 105.)

---

[11] Claimant contends that the ALJ "misread the evidence of record" when he stated in the decision " . . . there are no further treatment records from Prestera (Exhibit 11F)" and concluded that Claimant's depressive and anxiety disorders were "mild due to lack of mental health treatment." (Document No. 13 at 8-9, Tr. at 13.) Claimant questions this reasoning because there was ample evidence in the record that she received mental health treatment just before the administrative hearing. (Id.) The undersigned is also puzzled as to what this reference means, however, from the face of decision the ALJ considered the totality of Claimant's mental health treatment records, from September 20, 2011 through February 18, 2014, including Dr. Spelar's February 28, 2014 medical source statement, which preceded the administrative hearing by only five days. Further, the undersigned notes that pursuant to the Court Transcript Index, Exhibit 11F contained office treatment records dating from March 26, 1997 through February 25, 2014 from Lincoln Primary Care; this Exhibit did not contain mental health records from Prestera.

After thorough review of the ALJ's discussion and findings regarding the medical evidence of record, as well as the opinion evidence tendered in this case, the undersigned finds that the ALJ provided ample reasons for his conclusions, which were adequately explained in the written decision. Accordingly, the ALJ's evaluation of the opinion evidence, and in particular, his rejection of the opinion evidence from Dr. Spelar, and his adoption of the opinion evidence from Drs. Cloonan, and Wirts, was proper under the pertinent Regulations as well as controlling case law. See, Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984); Smith v. Cohen, 795 F.2d 343, 346 (4th Cir. 1986) (medical opinion of non-examining physician may be relied upon to assert denial of a claim where it is consistent with the medical findings of record). Accordingly, the Court finds the ALJ's evaluation of the opinion evidence is based upon substantial evidence.

RFC and Credibility Assessment:

The RFC finding is the reflection of a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996). Before an ALJ makes the RFC determination, the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, and whether the functional limitations from those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4). Social Security Ruling (SSR) 96-7p[12] clarifies when evaluating symptoms, including pain, 20 C.F.R. §§ 404.1529, 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; the Ruling also explains the factors to be considered in assessing the credibility of the individual's statements about symptoms, as well as the importance of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1. In short, a claimant's credibility will affect an ALJ's RFC finding.

Here, the ALJ expressly performed the two-step process for evaluating Claimant's pain and other subjective symptoms pursuant to Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). (Tr. at 15, 17.) The ALJ found Claimant "not fully credible" based on her testimony of having gained 50 pounds in the last year (Tr. at 51-52.) and currently weighing between 210 and 215 pounds when the objective medical records showed that her weight from November 2012 through January 2014 only fluctuated between 199 and 202 pounds. (Tr. at 17, 390, 484, 505.) Though Claimant testified that she does not use a computer, the ALJ noted that she "completed disability and 3368 via internet." (Tr. at 17, 203.) The ALJ further noted that Claimant alleged that she quit working due to marital problems, not physical or mental problems, and that she testified to having a ninth grade education, but alleged she completed the tenth grade on her applications. (Tr. at 17, 206, 207.) The ALJ found that Claimant alleged on her function report that she could prepare meals, drive a couple of times a day when warm enough, and can finish what she starts. (Tr. at 17, 220-227.) Claimant testified that she experienced multiple side effects to her medication, however, the ALJ noted she reported none of these to her treating physicians or her counselor at Prestera. (Tr. at 17, 284-301,

---

[12] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, March 27, 2014.

302-307, 421-478, 483-582.) Moreover, the ALJ contrasted this testimony to her report in February 2014 that she "was having a generally fair to good response with her depression and anxiety while taking her prescription psychotropic medication." (Tr. at 17, 433.) Finally, the ALJ recalled Claimant's testimony "that her medication for depression and anxiety does help." (Tr. at 17.)

From the foregoing discussion, the ALJ cited evidence in the record to support his credibility determination, and this Court may not re-weigh this evidence or supplant the ALJ's judgment with its own. Johnson, 434 F.3d at 654. Accordingly, the ALJ's credibility determination was proper and supported by substantial evidence.

With regard to the RFC assessment, the ALJ asked the VE a hypothetical question based on Claimant's age, education, and work experience, with restrictions from concentrated exposure to extreme cold, pulmonary irritants, and hazards, as well as limited to a work setting where there are few distractions, and may occasionally interact with supervisors, colleagues, and the public.[13] (Tr. at 64.) In response, the VE opined that an individual with Claimant's profile could perform a variety of jobs at the medium, light, and sedentary exertional levels that exist in the national and regional economies.[14] (Tr. at 63-65.) The ALJ found the number of the available jobs that Claimant could perform "significant." (Tr. at 19.) This finding precludes disability under the Regulations. See 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(c). Claimant contends that the RFC assessment does not properly reflect her severe mental limitations, that she would be absent from work five or more times every month, as found by Dr. Spelar; the VE testified that such absenteeism would preclude employment. (Tr. at 67.) As discussed above, the ALJ properly discounted Dr. Spelar's opinion due to inconsistencies with his own mental status findings as well as due to inconsistencies with

---

[13] It is noted that the ALJ's hypothetical to the VE included the limitations found by Drs. Cloonan and Wirts, *supra*.
[14] This finding further precludes Claimant from "gridding out" despite Claimant's alternative argument.

the medical evidence of record as a whole. The ALJ explicitly rejected that assessment due to Claimant's credibility and that there was no objective medical evidence in the record that showed she would miss five or more days of work per month. (Tr. at 19.) Further, the ALJ found Claimant's treatment regimen was "very modest" even after she obtained a medical card and that she reported being "fairly" stable on her medications. (Id.) The undersigned finds that the ALJ was permitted to determine Claimant's treatment was conservative and that her treatment supported his conclusion that she was able to maintain a routine work schedule. See, Sharp v. Colvin, 2016 WL 6677633 (4th Cir. 2016) (citing Wall v. Astrue, 561 F.3d 1048, 1058-60, 1069 (10th Cir. 2009) (concluding that claimant's treatment for pain, which included local anesthetic patches, Motrin, and cortisone injections in her back, was conservative).

In short, Claimant's RFC "fairly" set out all her impairments, insofar as the opinion evidence was properly evaluated, and given Claimant's mental limitations, the VE provided relevant evidence within his field of expertise that proved helpful to the ALJ.[15] (Tr. at 61-67.) Accordingly, the undersigned finds that the ALJ properly excluded Dr. Spelar's absenteeism findings in crafting Claimant's RFC and was therefore based upon substantial evidence. See, e.g., Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.) is

---

[15] The undersigned notes that even when questioned by Claimant's counsel to consider Claimant's "marked" impairments in her ability to interact with the public, supervisors, and coworkers as well as "marked" difficulties in ability to respond appropriately to usual work situations and changes in routine work settings, the VE responded that the same jobs he cited in response to the ALJ's hypotheticals would remain. (Tr. at 66-67.) These "marked" difficulties were found by Dr. Spelar in his medical source statement, *supra*.

**DENIED**, the Defendant's Motion for Judgment on the Pleadings (Document No. 16.) is

**GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is hereby

**DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: January 23, 2017.


Omar J. Aboulhosn
United States Magistrate Judge